

FILED
2020 JUN 26 P 1:39
U.S. DISTRICT COURT
EASTERN DIST. TENN.
DEPT CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) No. 3:20-cr-52 |
| v. | ) |
| | ) Judges Varlan / Poplin |
| VINCENT HARRIS | ) |
| | ) |

# INFORMATION

The United States Attorney charges that:

## BACKGROUND

1. At all times relevant to this information:

### Defendant and Related Entities

(a) TN Premier Care LLC ("TN Premier Care") was a Tennessee registered business entity doing business in the Eastern District of Tennessee.

(b) Florida Primary Sourcing LLC ("Florida Primary Sourcing") was a Florida registered business entity doing business in Boca Raton, Florida, and other places.

(c) Smart Support Professionals LLC ("Smart Support Professionals") was a North Dakota registered business entity doing business in Boca Raton, Florida, and other places.

(d) Company A was a Durable Medical Equipment ("DME") company that purportedly provided DME orthotics to Medicare and Medicare Advantage beneficiaries.

(e) Company B was a billing company that submitted doctors' orders for DME orthotics to Medicare and Medicare Advantage for reimbursement to TN Premier Care and other DME companies not named in this information.

1

(f) From on about July 2018 through the present, a person whose initials are I.C., who resides in the Eastern District of Tennessee, directed the operations of TN Premier Care by, for example, executing contracts and authorizing and signing checks on its behalf.

(g) From on or about July 2018 through in or about May 2019, a person whose initials are E.P. was the primary owner and operator of Florida Primary Sourcing.

(h) From on or about July 2018 through in or about May 2019, VINCENT HARRIS was the primary owner and operator of Smart Support Professionals.

(i) Individual 1 was one of the principal operators of Companies A and B.

### Medicare and Medicare Advantage

(j) The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were sixty-five years of age or older, or disabled. Medicare was administrated by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program," as defined in 18 U.S.C. § 24(b), and a "federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

(k) Individuals who qualified for Medicare benefits were commonly referred to as Medicare beneficiaries. Each beneficiary was given a Medicare identification number.

(l) Medicare was subdivided into multiple Parts:

    (i) **Medicare Part A** covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.

    (ii) **Medicare Part B** covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME"), such as orthotic devices and wheelchairs.

(iii) Together, Medicare Parts A and B were known as the original fee-for-service Medicare program, in which Medicare paid health care providers fees for services rendered to beneficiaries.

(iv) **Medicare Part C**, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed care plans, including health maintenance organizations and preferred provider organizations.

(m) Medicare beneficiaries who enrolled in Medicare Advantage plans had access to all of the same services provided by an original fee-for-service Medicare plan, and they also received mandatory supplemental benefits and optional supplemental benefits.

(n) To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare. Those companies were often referred to as Medicare Advantage plan "sponsors." A beneficiary's enrollment in a Medicare Advantage plan was voluntary.

(o) Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in fee-for-service plans under Medicare Parts A and B, CMS made fixed, monthly payments to a plan sponsor (e.g., Aetna, Humana, and others) for each Medicare beneficiary enrolled in the plans, regardless of the services rendered to the beneficiary that month or the cost of covering such services.

(p) Medicare beneficiaries who enrolled in Medicare Advantage plans chose to enroll in a managed care plan administered by private health insurance companies, health maintenance organizations, or preferred provider organizations. A number of entities were contracted by CMS to provide managed care to Medicare beneficiaries through various approved plans (e.g., Aetna, Highmark, Humana, among others). Such plans covered DME and related

health care benefits, items, and services. Among its responsibilities, these Medicare Advantage plans received, adjudicated, and paid the claims of authorized providers seeking reimbursements for the cost of DME orthotics and related health care benefits, items, or services supplied to Medicare beneficiaries.

## Durable Medical Equipment

(q) Orthotic devices were a type of DME that included rigid and semi-rigid devices such as ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively referred to as "orthotics").

(r) DME companies, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare providers. To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If CMS approved a provider's application, CMS assigned the provider a national provider identifier, often referred to as an NPI number. A healthcare provider with an NPI number could file claims with Medicare to obtain reimbursement for services rendered to Medicare and Medicare Advantage beneficiaries.

(s) Enrolled Medicare providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and other literature describing billing procedures, rules, and regulations.

(t) Medicare reimbursed DME companies and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare or Medicare Advantage, providers submitted or caused the submission of claims to Medicare or Medicare Advantage, either directly or through a billing company.

4

(u) A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician or other qualified medical professional who prescribed or ordered the equipment.

(v) A claim for a DME orthotic submitted to Medicare or Medicare Advantage qualified for reimbursement only if the DME orthotic was reasonable and necessary to the treatment of the beneficiary and prescribed by a licensed physician or other qualified medical professional.

## COUNT ONE

### (Conspiracy to Defraud the United States and Pay and Receive Kickbacks, 18 U.S.C. § 371)

2. All previous paragraphs of this Information are re-alleged and incorporated by reference as though fully set forth herein.

3. From on or about July 2018 to on or about May 2019, in the Eastern District of Tennessee and elsewhere, defendant VINCENT HARRIS, I.C., E.P., Individual 1, and others not charged herein, knowingly and willfully conspired and agreed together and with each other to commit offenses against the United States, that is:

(a) to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, and to commit certain offenses against the United States, that is:

(b) to violate 42 U.S.C. § 1320a-7b(b)(1)(B)—Solicitation and Receipt of Health Care Kickbacks—by knowingly and willfully soliciting and receiving remuneration,

5

specifically kickbacks, in return for ordering or arranging for or recommending purchasing any good, service, or item for which payment may be made in whole or in part by Medicare, a federal health program; and

(c) to violate 42 U.S.C. § 1320a-7b(b)(2)(B)—Offer and Payment of Kickbacks—by knowingly and willfully offering and paying remuneration, specifically kickbacks, to a person, to induce such person to order or arrange for or recommend ordering any good, service, or item for which payment may be made in whole or in part by Medicare, a federal health program.

## OBJECT OF THE CONSPIRACY

4. It was the purpose of the conspiracy for defendant VINCENT HARRIS and his co-conspirators—namely, I.C., E.P., Individual 1, and others not named in this information—to unlawfully enrich themselves and others by, among other things: (i) offering and paying, and soliciting and receiving, kickbacks in exchange for signed doctors' orders for DME orthotics for Medicare beneficiaries; (ii) submitting and causing the submission of false claims to Medicare for DME orthotics; (iii) concealing and causing the concealment of kickbacks and false and fraudulent claims, and (iv) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## MANNER AND MEANS

5. The manner and means by which VINCENT HARRIS, I.C., E.P., Individual 1, and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

6. VINCENT HARRIS operated Smart Support Professionals to achieve the objective of the scheme to defraud: to unlawfully enrich the members of the conspiracy by receiving kickbacks for signed doctors' orders for DME that were submitted to federal health care benefit programs.

6

7. E.P. operated Florida Primary Sourcing to achieve the objective of the scheme to defraud: to unlawfully enrich the members of the conspiracy by soliciting and receiving kickbacks, and by paying or offering to pay kickbacks, for signed doctors' orders for DME that were submitted to federal health care benefit programs.

8. I.C. operated TN Premier Care to achieve the objective of the scheme to defraud: to unlawfully enrich the members of the conspiracy by paying kickbacks for signed doctors' orders for DME that were submitted to federal health care benefit programs.

9. I.C. submitted an enrollment application to Medicare under the name of TN Premier Care for the submission of claims to Medicare for reimbursement. In that application, I.C. certified that TN Premier Care would comply with all Medicare rules and regulations, including that he and TN Premier Care would refrain from violating the Anti-Kickback Statute.

10. Notwithstanding that certification, I.C., through TN Premier Care, paid kickbacks to E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME and other Medicare-required documents.

11. VINCENT HARRIS, through Smart Support Professionals, (i) purchased components of signed doctors' orders, including recorded calls between call-center employees and Medicare beneficiaries; (ii) assembled those components into completed signed doctors' orders for DME; and (iii) sold the signed doctors' orders for DME to E.P., I.C., and others.

12. E.P, through Florida Primary Sourcing, sold signed doctors' orders for DME to I.C., through TN Premier Care, Company A, and others.

13. I.C., through TN Premier Care, transferred the signed doctors' orders for DME to Company B, which submitted the signed orders to Medicare and Medicare Advantage for reimbursement to TN Premier Care.

14. VINCENT HARRIS, E.P., I.C., Individual 1, employees of Company B, and others created, operated, and shared cloud-based document-storage accounts through Box and Dropbox. VINCENT HARRIS uploaded electronic copies of signed doctors' orders to the Box and Dropbox accounts so that E.P. and I.C. could access the signed doctors' orders. Once the signed orders were uploaded to the Box and Dropbox accounts, I.C., through TN Premier Care, paid a drop-shipper (i.e., a wholesaler that sold and shipped DME orthotics) to ship the DME orthotics to Medicare beneficiaries. Individual 1, through Company B, which specialized in submitting Medicare claims for reimbursement, also had access to the Box and Dropbox accounts and would submit claims for the signed orders to Medicare and Medicare Advantage for reimbursement to TN Premier Care.

15. The doctors who signed the DME orders that VINCENT HARRIS acquired and sold to E.P., and which I.C. ultimately submitted (or caused to be submitted) to Medicare and Medicare Advantage for reimbursement, often did so regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and sometimes based solely on a short telephonic conversation.

16. For example, on September 5, 2018, CMS notified TN Premier Care that it had received a complaint on August 23, 2018, from a Medicare beneficiary who had received a DME orthotic from TN Premier Care that she did not want. The beneficiary complained that she had unsuccessfully attempted to have TN Premier Care pick up the DME orthotic from her address.

17. To conceal the illegal kickbacks, VINCENT HARRIS, through Smart Support Professionals, I.C., through TN Premier Care, E.P., through Florida Primary Sourcing, and Individual 1, through Company B, created sham contracts and documentation that disguised the kickbacks as legitimate payments for marketing and consulting services when, in fact, the payments were for signed doctors' orders for DME. For example, a Consulting Agreement

8

between Florida Primary Sourcing and TN Premier Care required Florida Primary Sourcing to "develop[] future and current patient services and marketing . . . via telephone or other forms of remote correspondence." In return, TN Premier Care agreed to compensate Florida Primary Sourcing on a monthly basis to "reflect[] the potential of ideas and opportunities employed." In fact, Florida Primary Sourcing did not provide any marketing or consulting services to TN Premier Care.

18. To further conceal the illegal kickbacks, I.C. opened a separate bank in TN Premier Care's name for the purposes of paying kickbacks to E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME, and to pay Company B to submit the orders to Medicare and Medicare Advantage for reimbursement.

19. From in or about July 2018 to in or about May 2019, VINCENT HARRIS, through Smart Support Professionals, solicited and received illegal kickbacks from E.P., through Florida Primary Sourcing, in the amount of approximately $833,890, in exchange for signed doctors' orders for DME.

20. From in or about July 2018 to in or about May 2019, I.C., through TN Premier Care, paid illegal kickbacks to E.P., through Florida Primary Sourcing, in the amount of approximately $300,000, in exchange for signed doctors' orders for DME.

21. From in or about July 2018 to in or about May 2019, I.C. submitted and caused to be submitted, through TN Premier Care, approximately $778,429 in claims to Medicare for DME, for which he was reimbursed approximately $411,963.

22. From in or about July 2018 to in or about May 2019, E.P. received approximately $144,901 in fraud proceeds from the conspiracy for his own personal benefit.

9

## OVERT ACTS

23. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Eastern District of Tennessee and elsewhere, the following overt acts:

(a) In or around July 2018, E.P. signed a Marketing Services Agreement with Company A that falsely stated that Florida Primary Sourcing would provide "specialty marketing services" to Company A when, in reality, Florida Primary Sourcing provided only signed doctors' orders for DME to Company A in return for kickbacks.

(b) On July 26, 2018, Individual 1 emailed I.C. and E.P. to inquire whether they had received any reimbursement checks from Medicare, to which I.C. responded, on the same day, "We are keeping an eye out for ALL checks regarding DME."

(c) On or about August 7, 2018, I.C., through TN Premier Care, transferred $4,500 to E.P. and Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(d) On or about August 13, 2018, I.C., through TN Premier Care, transferred $7,100 to E.P. and Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(e) On or about August 13, 2018, VINCENT HARRIS, through Smart Support Professionals received $5,800 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(f) On August 15, 2018, I.C. emailed an employee with Company B and E.P. to inform them that he received a message from a Medicare beneficiary "requesting a return shipping label to return a brace he did not order." I.C. requested that Company B "reach out to [the beneficiary] to address his concerns."

(g) On or about August 20, 2018, I.C., through TN Premier Care, transferred $7,000 to E.P. and Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

10

(h) On or about August 20, 2018, VINCENT HARRIS, through Smart Support Professionals, received $5,900 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(i) On or about August 27, 2018, VINCENT HARRIS, through Smart Support Professionals, received $5,200 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(j) On or about August 30, 2018, I.C. emailed an employee with Company B and E.P., stating, "We have someone who claims a brace was sent to her mother. She apparently did not expect to receive a brace and will dis-guard [sic] the brace if someone does not call her about it today. . . . Also I have a brace that appears to have been sent back to my office. . . . What should I do with this package?"

(k) On September 20, 2018, I.C. emailed an employee with Company B, Individual 1, and E.P., stating, "I just uploaded more EOB and checks to the Shared Dropbox."

(l) On September 20, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., stating, "I have a patient that claims he did not expect the brace he received. . . . Who [sic] someone please call this patient to see what happened?"

(m) On or about September 25, 2018, I.C. emailed an employee with Company B, Individual 1, and E.P., stating that a beneficiary who had received a DME orthotic contacted TN Premier Care to complain that "he did not order a back support brace. His comment was 'this is a fraud.'"

(n) On September 26, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., stating, "We received a call from a patient claiming not having ordered braces (BACK & SHOULDER)."

11

(o) On October 3, 2018, E.P. emailed Individual 1 and an employee with Company B to inform them that all of TN Premier Care's signed doctors' orders for DME "are coming through my sources, so it would be easy for me track."

(p) On October 4, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., informing them that three Medicare beneficiaries had contacted TN Premier Care complaining that they had received DME orthotics that they did not order.

(q) On or about October 16, 2018, VINCENT HARRIS, through Smart Support Professionals, received $72,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(r) On October 18, 2018, I.C. emailed Individual 1, E.P., and an employee of Company B, stating, "Attached are correspondence from payors regarding pay backs and audits. Please review. This information is also in the Dropbox folder." The subject line of the email stated, "CMS Audits / Pay backs."

(s) On October 25, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., informing them that TN Premier Care had received returns of DME orthotics from two Medicare beneficiaries who had refused to accept delivery of the DME.

(t) On or about October 29, 2018, VINCENT HARRIS, through Smart Support Professionals, received $82,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(u) On October 31, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., informing them that two Medicare beneficiaries contacted TN Premier Care, one of whom stated that "he did not want the brace to begin with," and the other who returned the DME orthotic to TN Premier Care.

(v) On or about November 5, 2018, VINCENT HARRIS, through Smart Support Professionals, received $27,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(w) On November 6, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., informing them that two Medicare beneficiaries contacted TN Premier Care, one of whom had "receive[d] a back brace yesterday and another back brace today. She does not want either one and wishes to return them." The other beneficiary stated that she wanted to return the brace.

(x) On or about November 13, 2018, VINCENT HARRIS, through Smart Support Professionals, received $102,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(y) On or about November 28, 2018, VINCENT HARRIS, through Smart Support Professionals, received $52,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(z) On or about December 3, 2018, I.C., through TN Premier Care, transferred $25,000 to E.P. and Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(aa) On or about December 10, 2018, VINCENT HARRIS, through Smart Support Professionals, received $55,270 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(bb) On December 10, 2018, I.C. emailed Individual 1, an employee with Company B, and E.P., stating, "I have several returned items," and indicating that three Medicare beneficiaries had returned DME orthotics to TN Premier Care.

(cc) On or about December 11, 2018, I.C., through TN Premier Care, transferred $15,000 to E.P. and Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(dd) On or about December 14, 2018, VINCENT HARRIS, through Smart Support Professionals, received $67,125 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(ee) On or about December 26, 2018, VINCENT HARRIS, through Smart Support Professionals, received $67,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(ff) On or about December 26, 2018, I.C., through TN Premier Care, transferred $15,000 to E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(gg) On or about January 4, 2019, VINCENT HARRIS, through Smart Support Professionals, received $45,000 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(hh) In or about April 19, 2019, E.P., through Florida Primary Sourcing, electronically signed a Consulting Agreement that required Florida Primary Sourcing to provide consulting and advisory services to TN Premier Care.

(ii) On or about April 11, 2019, VINCENT HARRIS, through Smart Support Professionals, received $4,235 from E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

(jj) On or about May 15, 2019, I.C., through TN Premier Care, transferred $34,000 to E.P., through Florida Primary Sourcing, in exchange for signed doctors' orders for DME.

All in violation of 18 U.S.C. § 371.

J. Douglas Overbey
United States Attorney

By: _____
William A. Roach, Jr.
Assistant United States Attorney